UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

CASSANDRA LEE BROCK, as Administratrix
of the ESTATE OF NOEL X. COLON and
Guardian of the Property of Mercedez Colon

                                         **COMPLAINT**
                                         **CIVIL ACTION NO.:**

(Plaintiff)

vs.

                                    **JURY TRIAL DEMANDED**

DEP. STEPHANIE LOGSDON
DEP. AMBER PELLICANE
DEP.  CONNOR SANFORD
DEP. WILLIAM SCHWAN
DEP. SHAWN WHITFORD
JOHN DOES 1-5
JANE DOES 1-3
INDIVIDUALLY AND AS
EMPLOYEES OF THE LIVINGSTON
COUNTY SHERIFF'S DEPARTMENT
                        (Defendants)
_____

       Plaintiff Cassandra Lee Brock, ("Plaintiff') as Administratrix of the Estate of Noel X.

Colon ("Noel") and Guardian of the Property of Mercedez Colon ("Mercedez"), by and through

her attorneys, The Parrinello Law Firm, LLP, complaining of Defendants, alleges as follows:

## JURISDICTION

      1.   This action for monetary damages for violations of Plaintiff constitutional rights

brought pursuant to 42 U.S.C. 1983, 1985 1988 and related New York State law claims.  Plaintiff

alleges that the Defendants, while acting in their official capacities and under color of State Law,

searched, arrested, incarcerated Noel as an unarraigned detainee in the Livingston County Jail

("LCJ") in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiff also brings claims against Defendants under New York State laws for violation of LCJ Policy J38; negligence, wrongful death; and res ipsa loquitor including negligent searching and detention.

2.      This Court also has supplemental jurisdiction over claims asserted against the

Defendants under New York State law pursuant to 28 U.S.C. §1367.

## VENUE

3.   The venue is proper in the U.S. District Court for the Western District of New York pursuant to 28 U.S.C. § 1391 (e)(2) because the events or omissions giving rise to the Plaintiff's claims occurred in this judicial district, and at all times relevant herein all parties resided within this District.

## PARTIES

4.      Plaintiff Cassandra Lee Brock ("Plaintiff") is a citizen of the United States and currently resides in Livingston County, New York. Ms. Bock received Letters of Limited Administration for her significant other, Decedent Noel X. Colon ("Noel") respectively and Guardianship of the Property of Mercedez Colon, Noel surviving daughter from the Livingston County Surrogate's Court on February 26, 2018 and March 29, 2018

5.      At all times relevant herein, and upon information and belief, Defendant Shawn Whitford ("Whitford") was a citizen of New York State and was employed by the Livingston County Sheriff's as a Deputy, with his principal place of business being 4 Court Street, Geneseo, New York 14454. At all times relevant to this Complaint, Whitford was acting under color of law and is sued in his individual capacity and in his official capacity

as deputy sheriff, employed by the Livingston County Sheriff.

6.      At all times relevant herein, and upon information and belief, Defendant

<u>William Schwan</u> ("Schwan") was a citizen of New York State and was employed by the Livingston County Sheriff as a Deputy, with his principal place of business being 4 Court Street, Geneseo, New York 14454. At all times relevant to this Complaint, Schwan was acting under color of law and is sued in his individual capacity and in his official capacity as deputy sheriff employed by the Livingston County Sheriff.

7.      At all times relevant herein, and upon information and belief, Defendant

<u>Connor Sanford</u> ("Sanford") was a citizen of New York State and was employed by the Livingston County Sheriff as a Deputy, with his principal place of business being 4 Court Street, Geneseo, New York 14454. At all times relevant to this Complaint, Sanford was acting under color of law and is sued in his individual capacity and in his official capacity as a deputy sheriff employed by the Livingston County Sheriff.

8.      At all times relevant herein, and upon information and belief, Defendant

<u>Amber Pellicane</u> ("Pellicane") was a citizen of New York State and was employed by the Livingston County Sheriff as a Deputy, with her principal place of business being 4 Court Street, Geneseo, New York 14454. At all times relevant to this Complaint, Pellicane was acting under color of law and is sued in her individual capacity and in her official capacity as a deputy sheriff employed by the Livingston County Sheriff.

9.      At all times relevant herein, and upon information and belief, Defendant

<u>Stephanie Logsdon</u> ("Logsdon") was a citizen of New York State and was employed by the

Livingston County Sheriff as a Deputy, with her principal place of business being 4 Court Street, Geneseo, New York 14454. At all times relevant to this Complaint, Logsdon was acting under color of law and is sued in her individual capacity and in her official capacity as deputy sheriff employed by the Livingston County Sheriff.

10.     At all times relevant herein, and upon information and belief, Defendants John Does 1-5 were citizens of New York State and were employed by the Livingston County Sheriff as a Deputy, with their principal place of business being 4 Court Street, Geneseo, New York 14454.  At all times relevant to this Complaint, John Does' 1-5 were acting under color of law and are sued in their individual capacity and in their official capacities as a deputy sheriffs employed by the Livingston County Sheriff.

11.     At all times relevant herein, and upon information and belief, Defendants Jane Does 1-3 were citizens of New York State were employed by the Livingston County Sheriff as a Deputy, with their principal place of business being 4 Court Street, Geneseo, New York 14454. At all times relevant to this Complaint, Jane Does were acting under color of law and are sued in their individual capacity and in their official capacity as deputy sheriffs employed by the Livingston County Sheriff.

12.     All Defendants were acting under color of law and are sued in their individual capacities and their official capacities as deputy sheriffs for the Livingston County Sheriff.

**FACTS**

13.     The following facts are based on the information provided by Plaintiff, documents received pursuant to foil responses from the Livingston County Office of County Attorney dated March 19, 2018 and April 25, 2018, Plaintiff's testimony at the General

Municipal Law §50-h Hearing and the Monroe County Medical Examiner's Office.

14.     Prior to March 2011 and up to November 3, 2018, Noel and Plaintiff resided together in an apartment in Mt. Morris, New York.

15.     On March 2, 2011 Mercedez Marie Colon ("Mercedez") a female baby was born at the Warsaw Hospital in Warsaw, New York.

16.     On March 3, 2011 an Acknowledgement of Paternity was signed by Plaintiff and Noel each of them declaring to be the parents of Mercedez.

17.     On March 10, 2011 the Acknowledgment of Paternity was filed in the Village of Warsaw, New York.

18.     On November 2, 2017 Noel was arrested by Livingston County Sheriff Deputies.

19.     On November 3, 2017 Noel died in cell 4 of the Livingston County Jail where he was being held as an un-arraigned detainee as a result of an overdose of Fentanyl.

20.     On January 29, 2018 a verified Notice of Claim was served by Plaintiff on behalf of Noel's Estate and as the guardian of Mercedez the natural daughter of Noel. Plaintiff's petition to be appointed as an Administratrix of the Estate of Noel and Guardian of Mercedez was pending.

21.     On February 26, 2018 Letters of Limited Administration were issued to Plaintiff by Hon. Robert D. Wiggins, Judge of the Livingston County Surrogate Court, File no. 2018-23.

22.     On March 21, 2018 a General Municipal law Section 50-h Hearing was held in the Livingston County Government Center.

23.     On March 29, 2018 Letters of Guardianship (Property Only) were issued to Plaintiff by Hon.  Robert D. Wiggins, Judge of the Livingston Surrogate Court File No. 2018-

24.     On May 30, 2018 The attorney for the defendants' in a letter in response to the Notice of Claim stated in pertinent part

> Please be advised that the County is not interested in engaging in settlement discussions at the present time given that we do not believe that your client will be able to establish liability.  Even if she were the damages are limited.

25.     This action was timely commenced on January 31, 2019.

26.     Plaintiff is a licensed practical nurse who worked as an hourly employee for the past 6½ years.

27.     On November 2, 2017 and thereafter, Plaintiff has worked for approximately 40 plus, hours per week plus overtime. At the time of Noel's death on November 3, 2017, Noel had been living with Plaintiff and their daughter for approximately eight (8) years.

28.     At the time of Noel's death, Noel and Plaintiff had been engaged for seven (7) years and were saving money to get married.

29.     Prior to Noel's death he had not worked except at odd jobs including but not limited to landscaping and occasionally scrapping.

30.     At the time of Noel's death, Plaintiff and Noel were living in an apartment at 17 B Murray Street in Mt. Morris, New York.

31.     Prior to Noel's death, he was in and out of drug rehabilitation programs.

32.     As far as Plaintiff knew Noel had never been arrested for drug possession prior to November 2, 2018.

33.     Noel got his GED through Livingston County Boces.

34.     For approximate the last two weeks in October 2017, Noel voluntarily attended an inpatient program at Unity Hospital in Rochester, New York.

35.     Since Mercedez's birth until Noel's death, Noel was the primary caregiver of

their daughter Mercedez.

36.     Prior to Noel's death on November 3, 2017, except on rare occasions, no other daycare arrangements were in place for their daughter other than what Noel provided.

37.     Prior to Noel's death, Mercedez attended Mt. Morris Central School from 8:00 a.m. to 3:00 p.m. on weekdays.

38.     Plaintiff and Noel could not afford after-school care. After working as an LPN from 10:00 p.m. to 6:00 a.m. Plaintiff would return home, go to bed, leaving Noel in charge of Mercedez.

39.     After the Plaintiff went to bed in the morning after work Noel would get Mercedez up, help her dress, help feed her breakfast, get her ready for school and put her on the bus for school.

40.     In the afternoon Noel would meet the bus from school to take Mercedez home.

41.     Noel would help with the cooking, help Mercedez with her homework and made sure, that Mercedez took her shower and put her to bed.

42.     On occasion, Noel would take Mercedez to school activities and her appointments.

43.     Noel and Mercedez spent hours together every week before and after school and during the weekends forming a strong father/daughter bond and loving relationship.

44.     According to Plaintiff, Noel made some financial contributions to the household to help pay for the rent and groceries whenever Noel could.

45.     According to Plaintiff, Noel occasionally worked in the two (2) years before his death.

46.     According to Plaintiff, Noel earned some money to help with household expenses from landscaping and scrapping which were part-time jobs.

47.     According to Plaintiff, Noel performed tasks around the apartment such as mowing

the lawn and shoveling the driveway or sidewalk when it snowed.

48.    Noel also helped Plaintiff with grocery shopping and doing the laundry for the family.

49.    From <u>January to October of 2017</u> Plaintiff 's work schedule was from 10:00 p.m. on Sunday until 6:00 a.m. on Monday; 10:00 p.m. Monday to 6: 00 a.m. on Tuesday, had <u>Tuesday night off</u>; <u>Wednesday night off;</u> <u>Thursday night off</u> because Plaintiff was going to school to become an LPN;  then Plaintiff  returned to work at 6:00 p.m. on Friday until 6:00 a.m. Saturday, then back to work at  6:00 p.m. Saturday until 6:00 a.m. on Sunday; and then back to work Sunday at 10:00 p.m. starting the week over. Plaintiff did that every week from January to October 2017.  As noted above Noel provided daycare, etc. for their daughter Mercedez during that period of time.

## UNITY

50.     Prior to attending the Unity inpatient program during the last two (2) weeks of October 2017 (Noel) was abusing Fentanyl on a daily basis.

51.    Noel graduated from the outpatient program at Unity on November 1, 2017.

52.    On November 1, 2017 after he graduated from the Unity program Noel returned to the apartment that he shared with plaintiff and his daughter Mercedez.

53.     Upon information and belief, as a part of the Unity drug rehabilitation program, Noel was scheduled to attend outpatient meetings in Rochester, New York beginning November 2, 2017.

## NOVEMBER 2, 2017

54.     On November 2, 2017 Noel took Plaintiff's car at approximately 4:00 p.m. and told Plaintiff he was going to attend drug and alcohol outpatient meetings in Rochester.

55.    Plaintiff was scheduled to go to work at 10:00 p.m. on November 2, 2017.

56.    There was an understanding that Noel would be home before 10:00 p.m. on November 2, 2017.

57.    Plaintiff spoke to Noel through Facebook around 9:00 p.m. on November 2, 2017

58.    During a second conversation around 9:00 p.m. on November 2, 2017 Noel told Plaintiff that he was on his way home.

59.    Also during the second conversation after 9:00 p.m. on November 2, 2017, Noel told Plaintiff that he was having an anxiety attack and that was why he was running late.

60.    Plaintiff had a third conversation with Noel closer to 10:00 p.m. on November 2, 2017 during which Noel told the Plaintiff that he was coming into town and would be home soon and hung up.

61.    Plaintiff tried calling Noel after the 10:00 p.m. on November 2, 2017 several times but did not talk to Noel again that night.  Plaintiff's mother had to take care of Mercedez that night because Noel never showed up at home on November 2, 2017.

62.    On November 3, 2017 the Plaintiff's father called Plaintiff while Plaintiff was at work and told Plaintiff that Noel and Plaintiff's brother Nick Brock ("Nick') had been arrested.

63.    After speaking to her father Plaintiff called the Livingston County Jail from work.

64.     During the conversation with the Livingston County Jail, Plaintiff was told: "We're busy, call back."

65.     After Plaintiff got home at approximately 6:00 a.m. the morning of November 3, 2017, she got her daughter up and ready for school. After Mercedez's left for school Plaintiff called the jail back and was told that they couldn't give her any information.

**NOVEMBER 2, 2017**

66.   On November 2, 2017 Noel and Nick Brock, plaintiff's brother used plaintiff's vehicle to go to Rochester to attend two outpatient meetings. Plaintiff was not aware her brother Nick was with Noel on November 2, 2017.

67.   Upon arriving in Rochester Noel and Nick purchased an unknown number of bags of Fentanyl.

68.   After consuming 1 or more bags of Fentanyl Noel began driving back to 17 Murray Street, B in Mt. Morris, New York where plaintiff was waiting for Noel to return the car so that plaintiff could go to work.

**NOVEMBER 2, 2017—AUTO STOP—EXIT 7 ST. RTE 408**

69.   As Noel drove Plaintiff's 2008 Chevy Malibu on Interstate 390 South towards Mr. Morris a civilian female called 911 informing the dispatcher that she was flowing a 2008 Chevy driven by Noel and reported that the vehicle was being driven in an erratic manner.

70.   As the vehicle being driven by Noel left interstate 390 at Exit 7 onto St.  Rte. 480 Livingston County Sheriff Deputy Jerry Pilkenton ("Pilkenton") made a traffic stop of the vehicle Noel was operating.

71.   Pilkenton's traffic stop took place on November 2, 2017 at approximately at 9:41 p.m.

72.   Pilkenton approached the passenger side of Noel's vehicle and spoke to Nick Brock who was the passenger.

73.   As Pilkenton was talking to Brock, Whitford arrived at the scene and joined Pilkenton as Pilkenton spoke to Brock.

74.     After Brock told Pilkenton that he (Brock) has used Fentanyl "about a week ago" Brock consented to a search.  During the search of Brock by Pilkenton a bag containing <u>Heroin</u> was discovered in <u>Brock's left sock</u>.

75.     Whitford secured the bag that was found in <u>Brock's left sock</u> as evidence.

76.      Brock, refused to give a statement, was placed under arrest for Criminal Possession of a controlled substance in the 7th Degree and was transported to the Livingston County Jail where he was turned to over to booking deputies for pre-arraignment detention.

77.      Whitford subsequently approached the driver's side of the vehicle.

78.     Whitford had a conversation with the driver who was Noel. According to Whitford, Noel was obviously having issues <u>as tears rolled down Noel's face who was crying</u>.

79.     Whitford observed that <u>Noel's pupils were constricted</u>.

80.     Whitford asked Noel to exit the vehicle, and as Noel exited the vehicle, a white glassine bag fell out of the vehicle.

81.     The baggie was a used glassine Heroin bag.

82.     Whitford padded Noel down outside the vehicle. As Whitford padded Noel down, Whitford recovered a hypodermic instrument in Noel's left "shoe."

83.      Noel did not have a needle card and therefore was placed under arrest by Whitford for possessing the needle.  Noel was then secured in Whitford's patrol car 134.

84.      Whitford then returned to the stopped vehicle; had Brock exit the vehicle and began a search of the vehicle.

85.      When Brock exited the stopped vehicle, Whitford asked Brock if Whiteford could search Brock's wallet to which Brock said yes.

86.     Brock offered to take his shoes off.

87.     As Brock was taking off his socks starting with his left foot, Brock made a movement with his feet to conceal a plastic bag under his feet.

88.     Pilkenton noticed the bag and recovered one plastic bag containing Heroin from the street under Brock's feet.  Whitford field tested the suspected drug in the bag which tested positive for Heroin-Fentanyl.

89.     Before transporting Noel from the stop scene to the Livingston County Sheriff's Office Whitford had Noel take off his shoes and searched both of Noel's shoes, taking the lining out of both shoes during the search.

90.     Whitford also searched Noel's feet/socks.

91.     During the search of Noel at the stop scene, Whitford did not have Noel take off Noel's socks but claims to have felt around Noel's feet without Noel's shoes on.

92.     Whitford searched Noel's pockets and had Noel turn his pockets inside and out. No drugs were found.

93.     Nothing was found in Noel's pockets.  Whitford also patted down Noel and Whitford could not feel any foreign items in Noel's clothes.

94.      When Nick Brock was searched, at the scene of the stop the deputies had Nick take off his socks, but in Noel's case, Noel was not directed to take off his socks during his search at the stop scene.

95.     Whitford returned to his patrol car, where he had previously put Noel, had Noel exit his patrol car and administer five (5) field sobriety test which Noel failed.

96.     The copy of the results of the five (5) field test of Noel that were administered by Dep. Whitford on or about November 2, 2017 at or about 9:54 p.m. at the scene of the stop on St. Rte. 408 in the Town of Mt. Morris indicated among other things:

- <u>impaired motor condition</u>
- failed the walk and turn test.
- failed the one leg stand test.
- failed the Romberg balance test.
- failed of the finger to nose test.

97.     At the conclusion of the failed sobriety tests, Whitford concluded that Noel "…<u>did show signs of impairment</u>."

98.     Noel was charged with One Count of Criminally Possessing a Hypodermic instrument and One Count of DWAI -DRUGS.

99.     The drug paraphernalia found at the scene included a hypodermic needle and glassine bags.

100.     In the Livingston County Sheriff's DWI field notes of Whitford, it is noted that on or about November 2, 2017, at or about 9:54 p.m. that <u>Noel's speech was slow and raspy</u>; <u>Noel's coordination was poor</u>, and that <u>Noel was impaired</u>.

101.     Sometime after the observations and field sobriety test, Whitford put Noel back into his patrol car with his hands <u>handcuffed behind his back</u>.

102.     Whitford then spoke to the civilian complainant by phone who confirmed that Noel's vehicle "… was all over the roadway."

**<u>DRE</u>**

103.     On November 2, 2017, after Noel had been searched and tested by Whitford, Livingston County Sheriff's Deputy Connor Sanford ("Sanford") arrived at the area where Noel's vehicle had been stopped.

13

104.     After trying to contact an on-call -Drug Recognition Evaluation ("DRE") expert it was decided that Sanford, a DRE expert, would administer the DRE on Noel.

105.     After Noel's vehicle was towed away, Whitford took Noel to the Livingston County Sheriff's Office for a DRE evaluation and testing. Whitford met Deputy Sanford at the Livingston County Sheriff's Office at approximately 11:30 p.m. on November 2, 2017.

106.     Initial observation of suspect:  Sanford met Whitford and Noel in the briefing room at Livingston County Sheriff's Office to conduct the DRE.  Noel was wearing a red T-shirt, jeans and black sneakers. After explaining the evaluation process and as Sanford was setting up the DMT equipment used for his evaluation Noel explained what had happened that evening and the current situation regarding his addiction and recovery.

107.     Noel explained that he had just gotten out of a 14-day inpatient (sic) rehab the day before (11-1-17).

108.     Noel explained to the deputies that he (Noel) was addicted to Fentanyl and only tends to use Fentanyl and not Heroin.

109.     Noel told Whitford and Sanford that he (Noel) used 1-2 bundles a day for the past year or so.

110.     Noel explained that he was really trying to get clean and after getting out of inpatient rehab he was feeling much better.

111.     Noel admitted that earlier that day (11-02-2017) he (Noel) and his friend went to Rochester to attend a Narcotic Anonymous meeting.

112.     Noel stated that just before the meeting they each bought Fentanyl to use because they were nervous about talking at the meeting.

113.     Noel admitted that doing this was not a good idea as they were really trying to get clean, <u>but the temptation was there</u>.

114.     During the DRE Sanford observed Noel to be very friendly, cooperative and polite.  <u>Sandford also observed Noel's voice and speech to be low, slow, and raspy Sanford also observed Noel's pupils to be constricted and</u> <u>below the DRE average</u>.

115.     The New York State <u>Drug Influence Evaluation Form</u> indicates:

> -the evaluator was Dep. Conner Sanford.
> -that the recorder/witness was Dep. Whitford.
> -that the evaluation began on November 2, 2017 at 11:42 p.m.
> -that the evaluation was completed on November 3, 2017 at 00:43 a.m.
> -<u>Noel admitted taking one (1) bag of Fentanyl</u>.
> -<u>Noel's coordination was poor, unsteady</u>.
> -<u>Noel's speech was low, slow and raspy</u>.
> -<u>Noel's eyes were watery</u>.
> -<u>Noel failed the walk and turn test</u>.
> -<u>Noel failed the one leg stand test</u>.
> -<u>Noel failed the finger to nose test.</u>
> -<u>Noel's muscles was flaccid</u>.
> -<u>**That on the back of Noel's right and left there were small track marks, injection marks and scarring.**</u>

116.      The note attached to the New York State Drug Influence Evaluation indicate that Noel admitted taking one bag of Fentanyl at approximately at 4:30 p.m. on November 2, 2017 and further that <u>white residue was observed in Noel's right nostril</u>.

117.     In the opinion of Sanford who administered the Drug Recognition Evaluation and conditions noted above Sanford, who was a certified DRE expert concluded at ¶ 11 of his evaluation:

> **<u>In my opinion as a Drug Recognition Expert, Noel is under the influence of a Narcotic Analgesic and Central Nervous System Stimulant and is unable to operate a vehicle safely.</u>**

118**.**     The DRE on November 2, 2017 began at 11:42 p.m.  on November 2, 2017 and was completed at 00:43 a.m.  November 3, 2017.

119.     Noel was transported in the early morning hours of November 3, 2017 from the DRE location to the Livingston County Jail ("LCJ") by Whitford.  During this transport Noel was <u>handcuffed in the front</u> making it possible for Noel to hide the Fentanyl that eventually caused Noel's death.

120.     When Whitford and Noel arrived at the jail Whitford observed Deputies Schwan and Pellican <u>search</u> Noel in the intake.

121.     Schwan had Noel empty all of his pockets and front pockets were turned inside and out.

122.     The <u>Booking Card</u> indicates that Noel was booked on November 3, 2017 at 1:36 a.m.

123.     Dep. Schwan and Dep. Amber Pellicane <u>searched</u> Noel in <u>the intake</u> of the Livingston County Jail and failed to discover the Fentanyl patches secreted on Noel.

124.     <u>The Booking Card</u> indicated that the Booking Date/Time was 1:36 a.m. on November 3, 2017.

125.     The <u>Booking Data Sheet</u> indicates Booking start time was 2:25 a.m. and end time was 2:31 a.m. on November 3, 2017.

126.     The <u>booking deputy William Schwan</u> met the delivering agency (Whitford) in the "booking sally port" and <u>performed the initial screening of Noel</u>.

127.     Booking Deputy Schwan's **<u>Initial Screening Report</u>** was done on November 3, 2017 at <u>1:41 a.m</u>. and indicates in pertinent part the following:

| **QUESTIONS** | **RESPONSES** |
|---|---|
| 01-b Q:  Are there any visible injury or injuries? | Response: No (failed to note the needle marks on the back of Noel's hands) |
| 06   Q:  Do you have any <u>history of mental health illness or treatments</u>?<br>Comments: Outpatient | <u>Response: Yes:</u> |
| 07   Q: Have you ever been incarcerated before? | Response: No |
| 09   Q: Do you have any <u>history of drug</u> or alcohol <u>dependence</u>?<br>Comments: <u>Fentanyl</u> | <u>Response: Yes:</u> |

128.     Listed on the LCJ <u>Initial Screening and Risk Assessment</u> from was a column marked "special conditions" none of which of which were checked by Schwan. Among the "special conditions" that <u>were not</u> checked were <u>constant watch</u> and <u>medical condition</u>, both of which should have been marked to alert the jail staff that Noel needed <u>special attention</u>.

129.     Also listed on the LCJ Initial Screening and Risk Assessment form was a column marked "high risks" conditions none of which were checked by Schwan. Among the "high risk" conditions were the following:

130.     <u>Constant watch; medical condition and mental health</u>. The four (4) "high risk" conditions above should have been marked to alert the jail staff Noel needed "special attention"

131.     On November 3, 2017 at <u>1:43 a.m.</u> Schwan completed an **LCJ Suicide Prevention Screening**:

| **QUESTIONS** | **RESPONSES** |
|---|---|
| 01-b Q: The arresting officer believed that detainee maybe a suicide risk. | Response: No |
| 04    Q: Are you worried about any major problems other than this legal situation?<br>Comments:  <u>Recovery from drugs</u>. | <u>Response: Yes:</u> |
| 06   Q:  Do you have a history of drug or alcohol abuse?<br>Comments: <u>Past drug use</u>. | <u>Response: Yes:</u> |
| 07   Q: Do you have a history of mental health evaluation or treatment?<br>Comments:  <u>Outpatient</u> | <u>Response: Yes:</u> |

16-a   Q. <u>Detainee is apparently under the influence of drugs or alcohol</u>                    Response: No

132.     Whitford and Sanford's observations, test results and opinions <u>were apparently overlooked, ignored or not shared with by Schwan</u> when Noel was in booking.

133.     Included on the <u>LCJ Suicide Prevention Screening</u> document is a list of "high risks" that consisted of <u>constant watch; medical condition; and mental health among the items listed</u>.

134.     Schwan failed to check off any of the "high-risk" conditions.

135.     Also, on the <u>LCJ Suicide Prevention Screening</u> document there is a list under the heading "special conditions" none of which were checked off by Schwan.  That list includes <u>constant watch</u> and <u>medical condition</u>.

## PROPERTY REPORT

136.     The <u>Property Detail Report</u> indicates that at <u>1:45 a.m</u>. on November 3, 2017, Schwan had placed Noel's <u>sweatshirt, black and red shoes, red shirt, blue jeans, the vehicle registration</u> and Noel's <u>belt</u> into the property room. <u>Noel's socks were not listed a being put into the property</u> room and upon information and belief, in all likely-hood, the socks were on Noel's feet when he was put into Cell 4 where he died.

137.     There is no indication that Schwan had removed and placed <u>Noel's socks</u> in the property room

## CAMERA

138.     At some point after Noel's death, Whitford later reviewed his car camera system which captured Noel in the back seat of Whitford's car as Whitford transported Noel to the Livingston County Sheriff's Office for the DRE. The camera video during that period

of time did not show any movement or gesture on the part of Noel attempting to conceal or ingest any substances. **During this transport Noel was handcuffed behind his back**.

139.    Whitford then reviewed the same car camera recording system during the period of time that Whitford transported Noel from the Livingston County Road Office to the Livingston County Jail after the DRE evaluation.  During that transport period of time Whitford noticed that Noel was attempting to hide/conceal an item from his right pocket and small watch pocket.  The video also appeared to capture Noel as taking an item from his pants attempting to conceal it before entering the jail.  During the transport by Whitford of Noel from the DRE Evaluation to the jail Noel was **handcuffed in the front.**

### POST DEATH

140.    Logsdon was the Officer Supervising the death location.

141.    Logsdon's <u>supplemental report</u> dated November 3, 2017 indicates that she was stationed as the <u>booking officer.</u> At approximately 0630 a.m.  Jayme Babocsi ("Babocsi") came into booking to give the inmates their breakfast tray. When Babocsi took a tray to cell 4 where Noel was locked up.  Babocsi went into cell 4 and tried to wake up Noel but Noel was not responsive. Babocsi then calls code a blue.  At that time Schultz joined Babosci.  Both Deputies rolled Noel over and noticed that Noel's face was blue and there was **blood around Noel's nose**. During the course in trying to revive Noel approximately **four (4) Fentanyl wrappers were seen in the Cell**. Some on Noel's bunk with a reaper on it and another one stuck to Noel.

142.    Logsdon's report does not indicate what time Noel was put into Cell 4 or whether anyone checked on Noel every 30 minutes or less pursuant to Policy J38.

143.     The <u>supporting deposition of Anthony R. Maki,</u> a New York State Certified

Paramedic, indicates in pertinent part the following:

> At about 6:30 a.m., I received a dispatch to respond to the Livingston
> County Jail for a C-P-R in progress call.
>
> …I did observe an adult male patient on the floor of the cell.
>
> <u>Jail staff advised me that they had found drug paraphilia on the bed and
> on the floor and I also observed a wrapper stick to his right forearm</u>.
>
> The patient did appear to have mottling which is a blotchiness to the skin
> on both arms and lower legs, when his pant legs were cut.
>
> His jaw was clenched, and his body was cool to the touch.
>
> Also, Fentanyl is very potent.
>
> … I did remove the wrapper from his arm.
>
> Due to this information we believed his condition was due to a drug
> overdose.

144.     The final Certificate of Death states that the <u>manner of death</u> was "<u>Accident</u>"

and the <u>immediate cause</u> was "Combined efforts of the Fentanyl, and para-fluoro(ise)

Fentanyl, Butyrye Fentanyl" The death certificate is attached hereto as **<u>Exhibit A</u>**

145.      There is no indication Noel's time of death from the time Nel was put in Cell

4 to the time Noel's body was discovered at around 6:30 a.m. on November 3, 2017.

146.     NYS Commission on Correction is still in the process of investigating Noel's

death and expect to issue a report around March 2019.

147.      There were <u>no medical providers on duty in the Livingston County Jail on

November 3, 2017</u>, while Noel was present.

148.     During all times mentioned in this Complaint, the Defendants were acting under

color of state law, that is, under color of the U.S. Constitution, statutes, laws, charter, ordinances,

rules, regulations, customs, and Policy J38 of the County of Livingston's County Sheriff's Office.

149.    The Defendants, at all times mentioned in the Complaint, either knew or should have known that their actions clearly violated Noel's constitutional, statutory rights and the LCJ Policy J38.

150.    Defendants knew or should have known that their actions clearly violated established laws protecting Noel's 5th and 14th U.S. constitutional due process rights, Noel's N.Y.S. rights and the directives of LCJ Policy J38. A copy of Policy J38 of the LCJ is attached hereto as **Exhibit B.**

151.  It appears that none of the requirements of Policy J38 were followed from the time Noel arrived at the LCJ to the time he was found dead.


## **DETECTIVE**

152.    Plaintiff put her daughter on the school bus then a detective showed up at her door at approximately 9:00 a.m. on November 3, 2017 asking questions about Noel before the detective told the Plaintiff that Noel had passed away that morning and had four (4) bags of Fentanyl around Noel in the jail cell at the Livingston County Jail.

153.    The detective asked if Noel would put things in his butt. The Plaintiff answer not to her knowledge.

154.    When Plaintiff found out that Noel had died in jail, after the detective left, she went inside, broke down and called her parents.

### **SHERIFF**

155.    A month or so later Plaintiff spoke with Sheriff Dougherty of the Livingston County Sheriff's Department, on the phone.  The sheriff called to apologize for the way that Plaintiff found out about Noel's death.

156.     Plaintiff and the Sheriff talked about Noel being searched and needing to have probable cause to be stripped searched.

157.     Sheriff Dougherty said they can't strip search a person unless they have probable cause based on what the officers said and felt.  Sheriff Dougherty went on to tell Plaintiff that a concerned citizen had reported Noel's driving on 390 and that Nick and Noel were arrested after they had gotten off I 390 at exit 7 onto St. Rte. 408.

158.     The Sheriff also told Plaintiff that Noel was taken and tested to see if Noel was under the influence of drugs.

159.     Sheriff Dougherty said that two (2) deputies had tested Noel and that Noel arrived at the jail around 1:00 a.m.  on November 3, 2017 after being arrested around 10:00 p.m. on November 2, 2017.

160.     The Sheriff said that between the time Noel was arrested at 10:00 p.m. on November 2, 2017 until he got to the jail at approximately 1:00 a.m. on November 3, 2017 the deputies were testing Noel.

161.     Sheriff Dougherty told Plaintiff that they put Noel in a cell and when they went to do rounds later that morning that's when they found Noel dead.

162.     Plaintiff asked the Sheriff how Noel could get into a jail cell with four (4) bags of drugs to which the Sheriff responded that he wasn't sure and that there would be an investigation of everything.

163.     Plaintiff asked Sheriff Dougherty why Noel wasn't stripped searched to which the Sheriff said that a person couldn't be stripped searched because you needed probable cause and that was up to the officers.

### NICK

164.    Plaintiff spoke to her brother Nick who told her that he was with Noel in Rochester, New York, November 2, 2017 and they had bought Fentanyl.

165.    Nick told Plaintiff that they were pulled over by a Livingston County Sheriff Deputy who searched him.  At first nothing was found on Nick. However, when the sheriff deputies found the needle in Noel's shoe, they were both arrested and searched again at which time they found two (2) bags of Fentanyl on Nick.  Nick told Plaintiff that Noel had used Fentanyl that night before they got pulled over.

166.    Nick told Plaintiff that eventually he and Noel were put in separate cells.

167.    Nick told Plaintiff during the morning of November 3, 2017 there was a lot of commotion and everyone was rushing to Noel's cell.

168.    The Defendants, at all-time mentioned in the Complaint, either knew or should have known that their actions clearly violated Noel's constitutional, statutory rights and LCJ Policy J38.

169.  All defendants were acting in the scope of their employment in this case as Livingston County Deputy Sheriffs

## CAUSES OF ACTION

### AS FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

### 1983 Violation of Noel's Constitutional Rights under Color of State Law

170.    Plaintiff incorporates by reference and realleges each and every allegation stated herein.

171.     The Fifth and Fourteenth Amendment to the United States Constitution prohibits    anyone from depriving a person "of life" without due process.

172.    The actions and inactions of the Defendants detailed above violated Noel's rights under the Fifth and Fourteenth Amendments of the United States Constitution. In short, the Defendants' failed to thoroughly search and supervise Noel on November 2 and 3, 2017 after his arrest and during his incarceration. The Defendants' also failed to follow any of the mandates of the Livingston County Jail's Policy J 38 regarding un-arraigned detainees such as Noel.

173.    Defendants' actions demonstrate a denial of Noel's due process rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

174.    All of the Defendants were acting in their capacity as deputy sheriffs of the Livingston County Sheriff's Office under the color of state law, obligated to provide constitutionally mandated searches and supervision of Noel. As such Defendants' actions and inactions resulted in a violation of 42 U.S.C. § 1983.

175.    The Defendants' were obligated on November 2-3, 2017 to provide for the safety and supervision of un-arraigned jail detainees of the Livingston County Jail.

176.    As a direct and proximate result of the unconstitutional acts described above Noel suffered irreparably injuries and death.

177.    The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

**AS AND FOR A SECOND CAUSE OF ACTION AGAINST**
**-Violation of Livingston County Jail Policy J38-**

178.    Plaintiff incorporates by references and realleges each and every allegation stated herein.

179.     Livingston County Jail Policy J38 clearly establishes the manner in which Defendants' were to provide treatment of un- arraigned detainee with signs of drug addiction. The arrest, DRE testing of Noel should have alerted defendants to perform an intense search of Noel before he was accepted into the Livingston County Jail. Noel's condition when he arrived at the Livingston County Jail demanded a heightened need for intense supervision of Noel as dictated by the LCJ Policy J38. Defendants' failure to properly search and supervise as mandated by Noel Policy J38 was negligent as well as a violation of Noel's constitutional due process rights.

180.     Upon information on belief, the above-listed Defendants, through express policy, and practices dictated the manner to appropriately care for un-arraigned detainees at the Livingston County Jail such as Noel. Specifically, the defendants failed to follow the appropriate dictates of the Livingston County Jail Policy J38 regarding appropriate searches, supervision and/or screening of un-arraigned detainees like Noel who were in need of intense supervision because of the overwhelming evidence of Noel being under the influence of drugs and suffering mental health problems as detailed in the facts provided above. County jails such as the Livingston County Jail that have an appropriate written policy such as Policy J38 in place are mandated to follow said policies to prevent un-arraigned detainees from killing themselves, and/or accidently overdosing by placing Noel in a state of constant supervision. The J38 violation of Policy is evident given Noel's admitted Fentanyl addiction and determination by Whitford and Sanford that Noel was under the influence of Fentanyl (drugs).

181.     That determination, upon information and belief, was based on the obligation to conduct meaningful evaluations, intense searches and constant supervision before and after Noel was

put in Cell 4.

182.    Upon information and belief, one reason why Noel failed to receive an adequate search of his person and constant supervision was because of <u>the negligence</u> of jail personnel in carrying out their duties outlined in LCJ Policy J38.

183.    As the direct and proximate result of negligence and unconstitutional acts described above, Noel suffered death.  The Plaintiff expressly seeks damages for decedent's suffering and loss of life.

184.    As a direct and proximate result of the unconstitutional acts and failure to follow Policy J38 as described above, Noel X. Colon was irreparably injured when he died. The Plaintiff expressly seeks damages for decedent's pre-death pain and suffering and loss of life.

185.    The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.


### AS AND FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Violation of N.Y. State Law
### -- Negligence—

186.    Plaintiff incorporates by reference and realleges each and every allegation stated herein.

187.    The actions and/or inaction of the defendants detailed above support a claim for <u>conscious pain and suffering, pre-death terror and death</u> under the laws of the State of New York. Specifically, the Defendants' breach of their duty to provide for Noel's safe and secure detention was the proximate cause of Noel's suffering and death.

188.    Based on the negligent acts on the part of the Defendants Plaintiff asserts a

claim for conscious pain and suffering, pre-death terror, death, pecuniary damages against all Defendants, on behalf of Noel's Estate and Mercedez the child of Noel for her loss companionship, etc.

189.    As a direct and proximate result of the negligent acts described herein Noel and Mercedez suffered irreparable injuries.

190.        The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

## AS AND FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS

### Violation of State Law - Wrongful Death

191.        Plaintiff incorporates by reference and realleges each and every allegation stated herein.

192.        The actions of the Defendants detailed above supports a claim for wrongful death under the laws of the State of New York. Specifically, defendants failed to appropriately search and supervise Noel, who was exhibiting drug related symptoms.

193.        Additionally, Defendants are directly responsible for the actions and inactions of its various employees in the scope of their employment and consequently are directly responsible for decedent's conscious pain and suffering and wrongful death.

194.        As a direct and proximate result of the illegal acts described above, Noel's daughter was suffered pecuniary loss and result of the death of her father.

195.        The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction.

## FIFTH CAUSE OF ACTION AGAINST

- VIOLATION OF STATE LAW – Res Ipsa Loquitur

196.     Plaintiff incorporates by reference and realleges each and every allegation stated herein.

197.     The actions and inactions of the above-named defendants under New York law allows a jury to consider their circumstantial evidence in this case to infer that the Defendants were negligent in some unspecified way that caused Noel to suffer pre-death terror, pain and suffering and death.

198.     All defendants were employed by the Livingston County Sheriff's Office and came into contact with Noel on November 2 and 3, 2017 are responsible for Noel's suffering and wrongful death.

199.     Despite, two (2) or three (3) searches by defendants, presumably the use of the Boss chair, for some unexplained reason Noel was able to possess four (4) bags of Fentanyl in his cell which were later used by Noel causing Noel to suffer pre-death terror and death.

200.     Noel's ability to possess and use the Fentanyl is not explainable by the Defendants, speaks for itself, and caused the defendants to be responsible for Noel's pre-death terror and death. Based on the foregoing the defendants are jointly and severably responsible to compensate Noel's Estate and daughter a reasonable award of damages.

201.     This cause of action is brought by Plaintiff on behalf of Mercedez.

202.     As directed and proximate result of the acts described above, Plaintiff and Mercedez have been irreparably injured.

203.  The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction

## DEMAND FOR PUNITIVE DAMAGES

204.    The actions and inactions of all Defendants detailed above, especially when considering the pattern of misconduct by the Defendants in causing the death of Noel, are extreme and outrageous, entitling the Plaintiff to punitive damages against each individual defendants.

## DEMAND FOR TRIAL BY JURY

205.    The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff requests that this Honorable Court grant her the following relief:

A.  A judgment in favor of Plaintiff against all Defendants for compensatory damages in an amount to be determined by a properly charged jury;

B.  A judgment in favor of Plaintiff on behalf of Mercedez for wrongful death of Noel.

C.  A monetary award for attorney's fees and the costs of this action, pursuant to 42 U.S.C. § 1988;

D.  Punitive Damages against all individual Defendants.

E.   Any other relief that this Court finds to be just, proper and equitable.

Dated: January 31, 2019
      Rochester, NY

                              Respectfully Submitted,
                              s/ John R. Parrinello
                              THE PARRINELLO LAW FIRM, LLP
                              John R. Parrinello, Esq., of Counsel
                              Attorney for Plaintiff
                              36 West Main Street, Suite 400
                              Rochester, New York 14614
                              Phone: (585) 454-2321
                              Fax: (585) 454-6626
                              E-mail:  Contact@ parrinellolaw.com